# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

*United States of America v. Alex Leon Padgett*
Case No. 3:21-cr-00107-TMB-KFR

By: THE HONORABLE TIMOTHY M. BURGESS

PROCEEDINGS: ORDER FROM CHAMBERS

The matter comes before the Court on the Magistrate Judge's Final Report and Recommendation ("R&R")[1] recommending the Court deny Defendant Alex Leon Padgett's Motion to Dismiss Count 1 of the Indictment (the "Motion").[2] Padgett objects to the R&R "in its entirety" and lodges three specific objections.[3] Pursuant to statute, the Court has conducted a *de novo* review of the record and applicable law.[4] Based on that review, the Court **ACCEPTS and ADOPTS** the R&R at Docket 44 for the reasons discussed below. Accordingly, the Motion at Docket 24 is **DENIED**.

### A. Background

On November 7, 2021, Padgett was indicted by grand jury on a charge of Possession of Firearms by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(9) (Count 1).[5] The Indictment alleges that on or about July 17, 2021, Padgett was in possession of two firearms: a Ruger M77 Hawkeye .30-06 rifle and a Glock 17 9mm handgun.[6] The Indictment further alleges that at the time of the offense, Padgett had been convicted of a misdemeanor crime of domestic violence against his spouse.[7] Padgett was therefore barred from possessing firearms pursuant to § 922(g)(9), which prohibits individuals who "ha[ve] been convicted in any court of a misdemeanor crime of domestic violence" from possessing a firearm.

---

[1] Dkt. 44 (Final R&R).
[2] Dkt. 24 (Motion).
[3] Dkt. 41 at 2 (Defense Objections); *see also* Dkt. 45 (Defense Notice); Dkt. 48 (Government Supplemental Briefing); Dkt. 49 (Defense Supplemental Briefing).
[4] 28 U.S.C. § 636(b)(1)(C) ("Within fourteen days after being served with a copy [of the magistrate judge's proposed findings and recommendations], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge.").
[5] Dkt. 2 (Indictment); *see also* 18 U.S.C. §§ 922(g)(9), 924(a)(2).
[6] Dkt. 24 at 1–2. According to Padgett, he used the rifle to shoot and kill a bear that had previously killed one of his chickens and entered the children's play area in his backyard. *Id.* at 8. Padgett alleges that the rifle belonged to his girlfriend and that he "had access to [the] handgun in this home that he used for protection." *Id.* at 8.
[7] Dkt. 2 at 1–2.

1

After Padgett's indictment, the Supreme Court issued a decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*.[8] *Bruen* sets forth a two-part test that courts must apply when assessing whether a firearm regulation comports with the Second Amendment to the United States Constitution.[9] This framework "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."[10] Courts must first determine whether "the Second Amendment's plain text covers an individual's conduct."[11] If it does not, then the regulation is valid and the analysis ends there. But if the Second Amendment's text covers the conduct at issue, then the conduct is "presumptively protect[ed]," and courts must then determine whether the government has met its burden to "justify its regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation."[12] "Only if a firearm regulation is consistent with this Nation's historical traditional may a court conclude that the individual's conduct falls outside the Second Amendment's [protection]."[13]

Following *Bruen*, Padgett moved to dismiss Count 1 of the Indictment, arguing that § 922(g)(9)'s prohibition on possession of firearms by individuals with a misdemeanor domestic violence conviction violates the Second Amendment as interpreted in *Bruen*.[14] In the Motion, Padgett contends that he "may claim a protected Second Amendment right" to possess firearms despite having a misdemeanor domestic violence conviction, and that his "use of a firearm in defense of life and property" is "plainly covered by the scope of the Second Amendment."[15] Second, Padgett argues that there is "no American historical tradition" prohibiting possession of firearms by individuals with a misdemeanor domestic violence conviction.[16] As a result, Padgett insists, § 922(g)(9) is unconstitutional as applied to his conduct.[17]

The Government opposes, contesting each of Padgett's arguments.[18] First, the Government contends that as a person convicted of a domestic violence misdemeanor crime, Padgett is neither "law-abiding" nor "responsible," and is therefore not guaranteed the Second Amendment right to possess firearms.[19] Second, the Government argues that even if Padgett does enjoy Second Amendment rights, § 922(g)(9)'s prohibition on firearm possession by individuals convicted of

---

[8] Dkt. 24 at 7; 142 S. Ct. 2111 (2022).

[9] The Court adopts and will not repeat the Magistrate Judge's thoughtful summary of Second Amendment jurisprudence prior to *Bruen*. *See* Dkt. 44 at 4–6.

[10] *Bruen*, 142 S. Ct. at 2131.

[11] *Id.* at 2126.

[12] *Id.* at 2130.

[13] *Id.* at 2126.

[14] Dkt. 24; *see also* Fed. R. Crim. P. 12(b) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."); *United States v. Mayer*, 503 F.3d 740, 747 (9th Cir. 2007) (noting that dismissal of a criminal charge is appropriate when the charge is based on "a statute that is unconstitutional on its face or as applied") (citation omitted)).

[15] Dkt. 24 at 21–23.

[16] *Id.* at 23–36.

[17] *Id.* at 36–37.

[18] Dkt. 28 (Opposition).

[19] *Id.* at 5–6.

domestic violence misdemeanors is "consistent with this Nation's historical tradition of firearm regulation."[20] In support, the Government cites several potential historical analogues to § 922(g)(9), including founding-era proposals "recogniz[ing] the permissibility" of disarming convicted criminals and enacted laws "disarming people . . . deemed to be dangerous or untrustworthy."[21] Therefore, according to the Government, § 922(g)(9) is constitutional.[22]

### B. R&R and Objections

In the R&R, the Magistrate Judge determines that § 922(g)(9) is constitutional and recommends that the Court deny the Motion.[23] Citing *Bruen*'s repeated references to "law-abiding citizens," the Magistrate Judge finds that, at the first stage of *Bruen*'s inquiry, the plain text of the Second Amendment "likely does not cover [Padgett's] conduct" because the Second Amendment appears to "exclude . . . those convicted of misdemeanor[] crimes of domestic violence" from its scope.[24] However, the Magistrate Judge ultimately declines to recommend a ruling on this issue because: (1) prior to *Bruen*, the Ninth Circuit "reject[ed] arguments that 'domestic violence misdemeanants . . . have historically been restricted from bearing arms";[25] and (2) the Government has met its burden under the second part of the *Bruen* test to show that § 922(g)(9) is "part of the historical tradition of firearms regulation," which renders a ruling on the Second Amendment's scope "unnecessary."[26]

Turning to *Bruen*'s second question, the Magistrate Judge concludes that § 922(g)(9) "fits within this Nation's 'historical tradition of excluding felons and those who abuse their rights to commit violence from the rights and power of 'the people[.]'"[27] The Magistrate Judge describes § 922(g)(9) as a "[r]egulation[] affecting the rights of those who have engaged in criminal conduct or who possessed characteristics that make them a danger in the eyes of the elected legislature," and finds that such regulations "have a longstanding history."[28] In conducting this analysis, the Magistrate Judge refers to historical laws: (1) prohibiting public carry of weapons by those who "bear[] arms in a way that spreads 'fear' or 'terror' among the people";[29] (2) banning "gun

---

[20] *Id.* at 7–15.
[21] *Id.* at 10–15. These founding-era proposals consist of (1) the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, and (2) an amendment that Samuel Adams offered at the Massachusetts convention to ratify the Constitution. *Id.* at 11–12.
[22] *Id.* at 15.
[23] Dkt. 44 at 1.
[24] *Id.* at 11–12.
[25] *See United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013). The Magistrate Judge elaborates that "[w]hile the holding in *Chovan* is no longer of precedential value in light of its conflict with *Bruen*, . . . the Court still acknowledges the reasoning for that holding." Dkt. 44 at 12 n.64.
[26] Dkt. 44 at 12–13.
[27] *Id.* at 16 (alteration in R&R) (quoting *United States v. Collette*, No. MO:22-CR-00141-DC, --- F. Supp. 3d ---, 2022 WL 4476790, at *7 (W.D. Tex. Sept. 25, 2022)).
[28] *Id.* at 13 (internal quotation marks omitted).
[29] *Id.* at 15 (internal quotation marks omitted) (quoting *Bruen*, 142 S. Ct. at 2144–45).

3

ownership by free blacks, slaves, Native Americans, . . . those of mixed race," and those who "refused to swear loyalty oaths";[30] (3) and granting "[l]ocalized authority . . . to disarm or confine the mentally ill."[31] Determining that these historical laws, though largely "abhorrent," are sufficiently analogous to establish a tradition of firearm regulation, the Magistrate Judge recommends holding that § 922(g)(9) is not unconstitutional as applied to Padgett.[32]

Padgett objects to the R&R "in its entirety," though he also objects on three specific bases: that the Magistrate Judge (1) "ignore[d] text, history, and precedent" in concluding that domestic violence misdemeanants are outside the Framers' conception of "the people" entitled to keep and bear arms;[33] (2) applied the incorrect standard for evaluating the constitutionality of § 922(g)(9) under *Bruen*; and (3) erred by determining that the "racist and flagrantly discriminatory historical examples cited by the Government" are sufficiently analogous to § 922(g)(9) to uphold the regulation.[34]

   C. Discussion

Having reviewed the parties' initial and supplemental briefing, the R&R, Padgett's objections, and considerable Second Amendment case law before and since *Bruen*, the Court agrees with the Magistrate Judge that § 922(g)(9) is not unconstitutional as applied to Padgett and that the Motion should therefore be denied. The Court addresses each of Padgett's objections below.

   1. The Court need not decide whether the Second Amendment presumptively protects Padgett's alleged possession of firearms as a domestic violence misdemeanant.

In this case, *Bruen* requires the Court to first ask whether the Second Amendment's plain text covers Padgett's alleged possession of firearms despite his status as a domestic violence misdemeanant.[35] If it does, then the Court must evaluate whether § 922(g)(9) is consistent with this Nation's historical tradition of firearm regulation.[36]

The Magistrate Judge concludes at the first part of the *Bruen* inquiry that the Second Amendment's plain text "likely does not cover [Padgett's] conduct."[37] Drawing on the Supreme Court's repeated references in *Bruen* to "law-abiding citizens," the Magistrate Judge reasons that "[t]here is a strong argument" that domestic violence misdemeanants—as people who are not "law-abiding"—are

---

[30] *Id.* (quoting Adam Winkler, *Heller's Catch-22,* 56 UCLA L. REV. 1551, 1562–66–63 (2009)).
[31] *Id.* at 15–16 (internal quotation marks omitted) (citing Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1377 (2009)).
[32] *Id.* at 15–20.
[33] The Court includes within this objection Padgett's separately listed objection that the Magistrate Judge failed to properly apply *Chovan*. *See* Dkt. 41 at 4.
[34] *Id.* at 2–6.
[35] *See Bruen*, 142 S. Ct. at 2134–35.
[36] *See id.* at 2135.
[37] Dkt. 44 at 8.

4

excluded from the Second Amendment's reach.[38] However, the Magistrate Judge ultimately declines to decide whether the Second Amendment's plain text covers domestic violence misdemeanants such as Padgett for two reasons: (1) the Ninth Circuit in *United States v. Chovan*[39] rejected the argument that "domestic violence misdemeanants . . . have historically been restricted from bearing arms"; and (2) it is "unnecessary" to decide this issue because the Government prevails in the second part of the *Bruen* inquiry.[40]

Padgett objects, arguing that he is among those entitled to Second Amendment protections.[41] Pointing to excerpts from the Supreme Court's decision in *District of Columbia v. Heller*,[42] Padgett contends that "there is no precedent suggesting that individuals with prior criminal convictions inherently lack standing" to assert Second Amendment rights.[43] In addition, Padgett argues that the Magistrate Judge should have interpreted *Chovan* to hold that "domestic violence misdemeanants enjoy Second Amendment protections," resolving the first part of the *Bruen* inquiry.[44]

Padgett's objections reflect a debate that has existed for some time and intensified since *Bruen*. This debate concerns the scope of "the people" to whom the Second Amendment applies.[45] Although "[i]t is difficult to address th[is] issue without veering into semantics,"[46] courts have typically employed one of two competing approaches. The first approach, the "scope-of-the-right" or "civic-virtue" approach, holds that "there are certain groups of people—for example, violent felons—who fall entirely outside the Second Amendment's scope."[47] This approach relies on the Supreme Court's repeated use of the phrase "law-abiding citizens" when describing the Second

---

[38] *Id.* at 9–11.
[39] 735 F.3d 1127, 1137 (9th Cir. 2013).
[40] Dkt. 44 at 12–13.
[41] Dkt. 41 at 2.
[42] 554 U.S. 570 (2008).
[43] Dkt. 41 at 3.
[44] *Id.* at 4.
[45] U.S. Const. amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of the *people* to keep and bear Arms, shall not be infringed." (emphasis added)); *see also United States v. Bartucci*, No. 119CR00244ADABAM, 2023 WL 2189530, at *5–6 (E.D. Cal. Feb. 23, 2023) (observing that disagreement on this question "was in existence before *Bruen* and now post-*Bruen* is more alive than ever").
[46] *United States v. Hammond*, No. 422CR00177SHLHCA, 2023 WL 2319321, at *5 (S.D. Iowa Feb. 15, 2023)
[47] *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 142 S. Ct. 2111 (internal citations omitted); *see also Range v. Att'y Gen.*, 53 F.4th 262, 273 n.13 (3d Cir. 2022), *reh'g en banc granted, opinion vacated sub nom. Range v. Att'y Gen.*, 56 F.4th 992 (3d Cir. 2023).

5

Amendment's scope, first in *Heller*[48] and later in *Bruen*.[49] Based on this language, some courts have concluded that non-law-abiding citizens are excluded altogether from the Second Amendment's reach.[50]

The second approach, the "individual-right" approach, provides that "*all* people have the right to keep and bear arms but that history and tradition supports [legislatures'] power to strip certain groups of that right."[51] This approach finds support in *Heller*'s statement that "the people" broadly "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."[52] Courts following this approach have reasoned that it is consistent with "the typical way of conceptualizing constitutional rights," such as those protected by the First Amendment.[53] In a dissenting opinion

---

[48] *See* 554 U.S. at 625, 635; *see also id.* at 643 (Stevens, J., dissenting) (interpreting *Heller*'s majority opinion as "read[ing] the Second Amendment to . . . limit[] the protected class to 'law-abiding, responsible citizens'" (citing *id.* at 635)).

[49] *See* 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2135 n.8, 2138, 2138 n.9, 2150, 2156; *see also id.* at 2157–59, 2161 (Alito, J., concurring); *id.* at 2161 (Kavanaugh, J., concurring); *id.* at 2186–87, 2190, (Breyer, J., dissenting). Among the *Bruen* majority's references to "law-abiding citizens" is the following sentence: "It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." *Id.* at 2134.

[50] *See, e.g., Binderup v. Att'y Gen.*, 836 F.3d 336, 367 (3d Cir. 2016) (Hardiman, J., concurring), *abrogated by Bruen*, 142 S. Ct. 2111 ("[T]he Founders understood that not everyone possessed Second Amendment rights. These appeals require us to decide who count among 'the people' entitled to keep and bear arms. . . . The most germane evidence available directly supports the conclusion that the founding generation did not understand the right to keep and bear arms to extend to certain categories of people deemed too dangerous to possess firearms."); *Range*, 53 F.4th at 284 ("We believe the Supreme Court's repeated characterization of Second Amendment rights as belonging to 'law-abiding' citizens supports our conclusion that individuals convicted of felony-equivalent crimes, like Range, fall outside 'the people' entitled to keep and bear arms."); *United States v. Coleman*, No. 3:22-CR-8-2, 2023 WL 122401, at *2 (N.D. W. Va. Jan. 6, 2023) ("The bottom line is the Defendant's status as a felon removes him from 'the people' enumerated in the Second Amendment.").

[51] *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting) (internal citations omitted) (emphasis added); *see also*, *e.g.*, *United States v. Rahimi*, 61 F.4th 443, 451–53 (5th Cir. Feb. 2, 2023) (concluding that the Supreme Court's repeated use of the words "law-abiding" in *Heller* and *Bruen* do not "add a gloss on the Second Amendment that restricts its applicability to only 'law-abiding, responsible citizens'" (quoting *Heller*, 554 U.S. at 635)); *United States v. Coombes*, No. 22-CR-00189-GKF, --- F. Supp. 3d ---, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022) ("Based on existing precedent and well-established canons of construction, the court declines to carve out felons from the scope of the Second Amendment's protection of 'the people.' "); *Bernard*, 2022 WL 17416681, at *7 (same); *United States v. Perez-Gallan*, No. 22-CR-00427, 2022 WL 16858516, at *8–9 (W.D. Tex. Nov. 10, 2022) (same).

[52] 554 U.S. at 580.

[53] *See id.* (noting that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset");

in *Kanter v. Barr*, now-Justice Barrett described the "scope-of-the-right" approach as both "analytically awkward" and "at odds with *Heller*," and reasoned that the second approach is preferable because it reflects the historically-supported "proposition that the state can take away the right to bear arms away from a category of people that it deems dangerous."[54]

The Ninth Circuit has not yet ruled which approach is proper,[55] and the Court need not decide this issue today because it has no bearing on the Magistrate Judge's recommendation to deny the Motion.[56] As Justice Barrett observed in *Kanter*, "[t]hese [two] approaches will typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away."[57] And although the R&R contains a lengthy discussion of the merits of the parties' positions at the first stage of *Bruen*'s inquiry, the Magistrate Judge effectively assumes, without deciding, that the Second Amendment's plain text covers Padgett's conduct, and proceeds to analyze whether the Government met its burden to show that § 922(g)(9) is consistent with this Nation's historical tradition of firearm regulation.[58] The Court therefore need not disturb this portion of the R&R.

---

*but see, e.g.*, *Hammond*, 2023 WL 2319321, at *5 (questioning consistency of this approach with typical treatment of constitutional rights, noting: "A prison inmate, for example, has no right to leave the prison to engage in peaceable assembly with others despite the First Amendment's admonition that 'Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble . . . .' One therefore reasonably might describe the inmate as no longer being part of 'the people' protected by the peaceable assembly clause. Alternatively, one could define "the people" to include the inmate but nonetheless describe him or her as having 'lost' or 'forfeited' the right to peaceable assembly. So it is with 'the people' as used in the Second Amendment." (citation omitted)); *United States v. Hill*, No. CR H-22-249, 2022 WL 17069855, at *4 (S.D. Tex. Nov. 17, 2022) ("Like voting rights, Second Amendment rights are a privilege afforded to the political community and can be forfeited upon demonstration that an individual does not, or no longer, fits the criteria to be a member of that political community.").

[54] 919 F.3d at 458, 464 (Barrett, J., dissenting).

[55] In *United States v. Vongxay*, the Ninth Circuit observed that "most scholars of the Second Amendment agree that the right to bear arms was 'inextricably ... tied to' the concept of a 'virtuous citizen[ry]' that would protect society through 'defensive use of arms against criminals, oppressive officials, and foreign enemies alike,' and that 'the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals) . . . .'" 594 F.3d 1111, 1118 (9th Cir. 2010). The court recognized, though, that this "historical question has not been definitively resolved." *Id.*

[56] Nevertheless, the Court observes that the structure of the *Bruen* test appears to lend support to the individual-right approach. Namely, applying the scope-of-the-right approach tends to "shoehorn[] the government's historical-tradition burden" into *Bruen*'s first question, even though this question involves an analysis that is "based simply on the Second Amendment's plain text." *See United States v. Harrison*, No. CR-22-00328-PRW, 2023 WL 1771138, at *4 (W.D. Okla. Feb. 3, 2023).

[57] 919 F.3d at 452 (Barrett, J., dissenting).

[58] This approach is in keeping with how many courts have engaged in *Bruen* analyses. *See, e.g.*, *United States v. Jackson*, No. CR ELH-22-141, 2023 WL 2242873, at *9 (D. Md. Feb. 27, 2023); *Hammond*, 2023 WL 2319321, at *4–6.

Furthermore, the Court disagrees with Padgett that *Chovan* definitively resolves the issue of whether the Second Amendment's plain text covers domestic violence misdemeanants. *Chovan* held that "by prohibiting domestic violence misdemeanants from possessing firearms, § 922(g)(9) burdens rights protected by the Second Amendment."[59] In coming to this conclusion, the Ninth Circuit relied exclusively on historical evidence of similar regulations and did not address the Second Amendment's text.[60] Moreover, the court merely assumed that the defendant was entitled to Second Amendment rights, observing that it was unable "to say that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors."[61] The *Chovan* court's analysis reflects the distinct analytical framework that was in place at the time and that *Bruen* abrogated, and shows that the court did not "appl[y] the first step" of *Bruen*, as Padgett suggests.[62] The Court therefore rejects Padgett's contention that the Magistrate Judge failed to afford *Chovan* proper weight.

   2. The Magistrate Judge applied the correct standard under *Bruen* in analyzing § 922(g)(9)'s constitutionality.

The second part of the *Bruen* inquiry asks whether the Government has justified the regulation at issue by "demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."[63] In engaging in this analysis, the Magistrate Judge concludes that although there were no equivalents to § 922(g)(9) at the time of the founding, the Court should uphold the regulation because the Government met its burden to identify a "well-established and representative historical analogue."[64]

Padgett argues that the Magistrate Judge "misconstrues" the standard to be applied at the second stage of *Bruen*'s inquiry because "[t]he character" of this inquiry "depends on the nature of the [firearm] regulation at issue."[65] Specifically, Padgett draws a distinction between regulations that address a "general societal problem that has existed since the 18th century," and those that implicate "unprecedented societal concerns or dramatic technological changes" or that would have been "unimaginable at the founding."[66] According to Padgett, when a regulation addresses a "general societal problem that has existed since the 18th century," courts may uphold the regulation only if a "distinctly similar" tradition of firearm regulation exists.[67] But when a regulation implicates "unprecedented societal concerns or dramatic technological changes" or was "unimaginable at the founding," courts may uphold the regulation if "relevantly similar" historical antecedents exist.[68] Padgett contends that the Magistrate Judge failed to distinguish between these

---

[59] 735 F.3d at 1137.
[60] *See id.*
[61] *Id.* (quoting *United States v. Chester*, 628 F.3d 673, 681–82 (4th Cir. 2010)).
[62] *See* Dkt. 41 at 4.
[63] 142 S. Ct. at 2130.
[64] Dkt. 44 at 15 (quoting *Bruen*, 142 S. Ct. at 2133).
[65] Dkt. 41 at 5.
[66] *Id.* (quoting *Bruen*, 142 S. Ct. at 2129, 2131–32).
[67] *Id.* (quoting *Bruen*, 142 S. Ct. at 2129).
[68] *Id.* (quoting *Bruen*, 142 S. Ct. at 2131–33).

8

"different standards" and should not have compared § 922(g)(9) with regulations that are not "distinctly similar" to it.[69]

To address this objection, the Court looks to pertinent passages of *Bruen*, including those from which Padgett quotes. The Supreme Court observed that the "focus on history" in the second stage of the *Bruen* inquiry "comports with how [courts] assess many . . . constitutional claims"; that is, by "look[ing] to history for guidance."[70] Acknowledging that "[h]istorical analysis can be difficult" and may require "nuanced judgments,"[71] the Supreme Court offered some direction for courts when evaluating whether a particular modern law is consistent with historical tradition. For example, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is *relevant evidence* that the challenged regulation is inconsistent with the Second Amendment."[72] Similarly, "if earlier generations addressed the societal problem, but did so through materially different means, that *also could be evidence* that a modern regulation is unconstitutional."[73] And "if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide *some probative evidence*" of unconstitutionality.[74]

At the same time, the Supreme Court observed that the "regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868."[75] In "cases implicating unprecedented societal concerns or dramatic technological changes," historical analogies may not be as "simple to draw" and courts may need to take "a more nuanced approach."[76] When considering modern firearm regulations that were "unimaginable at the founding," courts must determine—as is the case with "all analogical reasoning"—whether the two regulations are "relevantly similar."[77]

The Supreme Court clarified that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check."[78] Along similar lines, the Supreme Court

---

[69] *Id.* at 6.
[70] *Bruen*, 142 S. Ct. at 2130 (internal quotation marks omitted).
[71] *Id.* (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 804 (2010) (Scalia, J., concurring) (alteration in *Bruen*).
[72] *Id.* at 2131 (emphasis added).
[73] *Id.* (emphasis added).
[74] *Id.* (emphasis added).
[75] *Id.* at 2132.
[76] *Id.*
[77] *Id.* (internal quotation marks omitted) (citing Cass Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)).
[78] *Id.* at 2133. The Supreme Court also noted: "On the one hand, courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.' On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.* (citation omitted) (alteration in *Bruen*) (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3rd Cir. 2021)).

9

highlighted the flexibility of the Constitution and the Second Amendment, noting that they were "intended to endure for ages to come, and consequently, to be adopted to the various crises of human affairs."[79] Furthermore, the Supreme Court remarked that although the "meaning" of the Constitution "is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated."[80] To that end, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."[81]

To the extent Padgett interprets these passages to preclude courts from engaging in certain types of analogical reasoning to determine whether a modern regulation is constitutional, the Court disagrees. Although *Bruen* offers non-exhaustive guidance for what the Court might consider to be "relevant" or "probative" evidence when a regulation addresses a persistent "societal problem," it does not suggest that any of this evidence—such as "the lack of a distinctly similar historical regulation"[82]—is dispositive of the regulation's constitutionality. Comparisons to historical antecedents that share only broad commonalities may be most compelling in cases involving regulations that were "unimaginable at the founding" or that involve "unprecedented societal concerns."[83] But *Bruen* indicates that courts may properly weigh evidence of such historical antecedents against the other available evidence in any given case. "Otherwise, some [firearm] restrictions that the Founders would have 'believed to be permissible' would fail simply because they 'happened [not] to exist in the founding era.'"[84] Such an outcome would be inconsistent with *Bruen*'s exhortation that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated."[85]

To be sure, some historical analyses may be more "straightforward" and others "more nuanced."[86] Yet no matter where a case falls on this spectrum, the Government has the burden to identify historical evidence demonstrating a "comparable tradition of regulation."[87] The Supreme Court's own analysis of the law at issue in *Bruen*, which required an applicant for an unrestricted license to carry a handgun in public to show a "special need for self-defense,"[88] bears this out. Even though

---

[79] *Id.* at 2132 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819)).
[80] *Id.*
[81] *Id.* at 2133.
[82] *Id.* at 2131.
[83] *See id.* at 2131–32.
[84] *Jackson*, 2023 WL 2242873, at *12 (quoting *United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022)).
[85] *See Bruen*, 142 S. Ct. at 2132 ("[T]he Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.").
[86] *See id.* at 2131–32; *see also Kelly*, 2022 WL 17336578, at *2 (explaining that courts engaging in *Bruen*'s historical analysis must not only "consider what earlier legislatures did, but imagine what they could have imagined," because "a list of the laws that happened to exist in the founding era is, as a matter of basic logic, not the same thing as an exhaustive account of what laws would have been theoretically believed to be permissible by an individual sharing the original public understanding of the Constitution").
[87] *Bruen*, 142 S. Ct. at 2131–32.
[88] *Id.* at 2122.

this New York law addressed a persistent problem—handgun violence, primarily in urban areas[89]—the Supreme Court "still scoured centuries of English and American history for relevant analogues when it applied the test to New York's law."[90] The Supreme Court considered various potential analogues from the historical record, including colonial statutes that "codified the existing common-law offense of bearing arms to terrorize the people," founding-era statutes that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people," and Western territorial restrictions on public carry.[91] Weighing various factors, including "how and why" these laws burdened public carry," the laws' historical prevalence, and the laws' temporal proximity to the founding, the Supreme Court ultimately held that these analogues did not demonstrate "an American tradition justifying [New York's] proper-cause requirement."[92] The Supreme Court's analysis lends further support to the conclusion that courts may properly consider evidence of any historical analogues brought to their attention, and that their task under the second part of *Bruen*'s inquiry is to "assess which similarities are important and which are not" in determining whether a comparable tradition of regulation exists.[93]

For these reasons, the Court rejects Padgett's objection that *Bruen* sets forth different standards depending on whether the regulation at issue: (1) addresses a "general societal problem that has persisted since the 18th century"; (2) implicates "unprecedented societal concerns or dramatic technological changes"; or (3) was "unimaginable at the founding."[94] The Magistrate Judge did not err by considering the Government's propounded historical analogues to § 922(g)(9) and by stating that, pursuant to *Bruen*, a "well-established and representative historical analogue" may suffice to find a comparable tradition of regulation.[95] The Court therefore declines to modify the R&R on this basis.

> 3. The Magistrate Judge correctly concluded that § 922(g)(9) is consistent with this Nation's historical tradition of firearm regulation.

The Magistrate Judge finds that the Government carried its burden of showing that § 922(g)(9) is a "regulation [that] is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[96] Describing § 922(g)(9) as a regulation that "criminalizes the possession of

---

[89] *See id.* at 2131–32 (noting that challenged law concerned "the same alleged societal problem addressed in *Heller*," and "the Founders themselves could have adopted [similar laws] to confront that problem").
[90] *Jackson*, 2023 WL 2242874, at *12 (citing *Bruen*, 142 S. Ct. at 2135–56).
[91] *Bruen*, 142 S. Ct. at 2143–44, 2153–55.
[92] *See id.* at 2139–56; *see also id.* at 2155 (concluding that territorial restrictions "deserve little weight" in part "because they were—consistent with the transitory nature of territorial government—short lived").
[93] *See id.* at 2132 (quoting Frederick Schauer & Barbara A. Spellman, *Analogy, Expertise, and Experience*, 84 U. CHI. L. REV. 249, 254 (2017)); *see also Firearms Pol'y Coal., Inc. v. McCraw*, No. 4:21-cv-1245-P, --- F. Supp. 3d ---, 2022 WL 3656996, at *8 (N.D. Tex. Aug. 25, 2022) ("Courts use analogical reasoning to determine whether a modern regulation is constitutional.").
[94] *See Bruen*, 142 S. Ct. at 2131–32.
[95] *See id.* at 2133.
[96] Dkt. 44 at 13 (quoting *Bruen*, 142 S. Ct. at 2127).

11

guns by individuals Congress has determined are dangerous," the Magistrate Judge states that "the historical record demonstrates that the regulation of individuals deemed dangerous by the legislature—like those who commit domestic violences crimes—was prevalent."[97] The Magistrate Judge relies on founding-era laws that: (1) prohibited those who "bear[] arms in a way that spreads 'fear' or 'terror' among the people" from carrying arms; (2) banned gun ownership by "free blacks, slaves, Native Americans, . . . those of mixed race," and those who "refused to swear loyalty oaths"; and (3) permitted disarming the mentally ill.[98] Based on this evidence, the Magistrate Judge concludes that § 922(g)(9) is constitutional because it is consistent with a "historical tradition of excluding felons and those who abuse their rights to commit violence from the rights and power of 'the people[.]'"[99]

Padgett objects, arguing that the Magistrate Judge's reliance on these historical analogues is flawed because they "do not bear any meaningful resemblance to modern-day laws that disarm citizens based on criminal history," such as § 922(g)(9).[100] Padgett further argues that the lack of any "laws that categorically prohibited felons, much less persons with misdemeanor convictions, from possessing firearms" before 1938 is "compelling evidence that § 922(g)(9) is unconstitutional."[101]

In addressing Padgett's objection, the Court finds Justice Barrett's dissent in *Kanter* particularly instructive. In this dissent, Justice Barrett explained that she would have held 18 U.S.C. § 922(g)(1), which bans all felons from possessing firearms, unconstitutional as applied to the appellant, who had been convicted of only a nonviolent felony.[102] Justice Barrett reasoned that although history "support[s] the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous," that authority "extends only to people who are dangerous."[103] Justice Barrett concluded that legislatures may disarm classes of people, including, specifically, "those convicted of crimes of domestic violence."[104] "Short of concluding that []Justice Barrett had a change of heart in the three years between *Kanter* and *Bruen*, it is difficult to believe she signed onto a majority opinion in the latter that undermined her conclusion in the former" that laws such as § 922(g)(9) are constitutional.[105]

Moreover, Justice Barrett expressed a view that legislatures may impose class-wide restrictions "based on *present-day judgments* about categories of people whose possession of guns would

---

[97] *Id.* at 15.
[98] *Id.* at 15–16 (first quoting *Bruen*, 142 S. Ct. at 2144–45, then quoting Adam Winkler, Heller's *Catch-22,* 56 UCLA L. REV. 1551, 1562–66–63 (2009)).
[99] *Id.* at 16 (quoting *Collette*, 2022 WL 4476790, at *7).
[100] Dkt. 41 at 6.
[101] *Id.* at 5.
[102] *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting).
[103] *Id.* at 453, 464; *see also Binderup*, 836 F.3d at 369 (Hardiman, J., concurring) ("[T]he historical record leads us to conclude that the public understanding of the scope of the Second Amendment was tethered to the principle that the Constitution permitted the dispossession of persons who demonstrated that they would present a danger to the public if armed.").
[104] *See Kanter*, 919 F.3d at 453, 464 (Barrett, J., dissenting) (citing *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010)).
[105] *Hammond*, 2023 WL 2319321, at *3.

12

endanger the public safety,"[106] reasoning that "[s]uch restrictions are 'lineal descendants' of historical laws banning dangerous people from possessing guns."[107] For this reason, the Court finds that the fact that domestic violence "was not even illegal when the Second Amendment was adopted, much less a basis for taking away someone's firearms," is not persuasive evidence that § 922(g)(9) is unconstitutional.[108] To the contrary, this evidence—along with evidence that domestic violence was not consistently disapproved of[109]—may suggest that although domestic violence *existed* at the time of the founding, it was not a "challenge[] . . . that preoccupied the Founders"[110] or widely perceived as a societal problem.[111] In other words, the Court is persuaded that under *Bruen*, legislatures may restrict firearm possession to groups viewed as dangerous in modern times, not only to those viewed as dangerous in 1791.[112]

---

[106] 919 F.3d at 464–65 (Barrett, J., dissenting) (emphasis added) (citing *Skoien*, 614 F.3d at 641 ("[E]xclusions need not mirror limits that were on the books in 1791.")).

[107] *Id.* at 465 (quoting Transcript of Oral Argument at 77, *Heller*, 554 U.S. 570 (No. 07290)).

[108] *Hammond*, 2023 WL 2319321, at *6; *see also United States v. Jackson*, No. CR-22-59-D, 2022 WL 3582504, at *3 (W.D. Okla. Aug. 19, 2022) ("Legal scholars have commented on the paucity of evidence that American traditions reached within the home to interfere with domestic relationships, particularly the marital relationship.").

[109] *See Jackson*, 2022 WL 3582504, at *3 ("[I]n the United States, the common law recognized until the mid-1800's a 'right of chastisement' that allowed husbands to inflict corporal punishment on their wives."); *United States v. Perez-Gallan*, No. PE:22-CR-00427-DC, --- F. Supp. 3d ---, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022) ("Domestic abusers are not new. But until the mid-1970s, government intervention—much less removing an individual's firearms—because of domestic violence practically did not exist. A reason for that was how infrequently domestic abusers were prosecuted. . . . [A]ny prosecution of domestic violence charges [in the 18th century] 'were remnants of a much more extensive form of social policing that ended with the demise of the Puritan experiment.' . . . [E]ven in the late nineteenth century, many states still adhered to the belief that without serious violence, the government should not interfere in familial affairs." (quoting ELIZABETH PLECK, DOMESTIC TYRANNY: THE MAKING OF AMERICAN SOCIAL POLICY AGAINST FAMILY VIOLENCE FROM COLONIAL TIMES TO THE PRESENT 27 (1987))).

[110] *See Bruen*, 142 S. Ct. at 2132.

[111] As the Magistrate Judge observes, § 922(g)(9) was enacted to "close the dangerous loophole" that "many people who engage in serious spousal or child abuse ultimately are not charged with or convicted of felonies" and therefore not subject to the federal prohibition on possession of firearms by felons. Dkt. 44 at 14 n.70 (citing *Hayes*, 555 U.S. at 426 (describing congressional statement in support of § 922(g)(9)'s enactment)). "Such concerns are well-supported by empirical evidence and statistics regarding domestic violence, recidivism by those convicted of misdemeanor crimes of domestic violence, and increased risks of serious harm and death posed when firearms are present in connection with domestic violence." *Id.* at 14.

[112] *Cf. United States v. Quiroz*, No. PE:22-CR-00104-DC, --- F. Supp. 3d ---, 2022 WL 4352482, at *8 (W.D. Tex. Sept. 19, 2022) ("Society, population density, and modern technologies are all examples of change that would make something [that was] unthinkable in 1791 a valid societal concern [today].").

13

Since *Bruen*, courts have unanimously rejected challenges to § 922(g)(9) for varying reasons,[113] with many grounding their analyses in a historical tradition of restricting firearm possession by groups perceived as dangerous, including domestic violence misdemeanants.[114] As one court recently stated: "The conclusion is clear that disarming persons deemed dangerous has been grounded in the heartland of acceptable gun regulation since our Nation's founding. Ignoring this history would disregard the admonition of the Supreme Court that 'while the Constitution protects against invasions of individual rights, it is not a suicide pact.'"[115]

Even courts that have held other § 922 subsections unconstitutional have reached similar conclusions. For example, in *United States v. Harrison*, which involved a challenge to 18 U.S.C. § 922(g)(3),[116] the court determined that "[d]ispossession on the basis of a conviction for [a crime involving past violent, forceful, or threatening conduct] comports with the original public understanding of the scope of the right to keep and bear arms."[117] The court reached this conclusion based on evidence of historical laws "limiting the right to carry a firearm while actively intoxicated[,] . . . surety statutes that were enacted in a few states in the mid-to-late nineteenth century[,] . . . [and] [l]aws targeting those who engaged in rebellion."[118] Noting that these laws were all "justified on the grounds that such persons posed a danger to public safety," the court concluded that these laws "demonstrate that limitations on the right to armed self-defense 'were tied to dangerousness.'"[119] In addition, the court mentioned that "the past conduct of . . . a

---

[113] *United States v. Bruner*, No. CR-22-518-SLP, 2023 WL 2653392, at *2 (W.D. Okla. Mar. 27, 2023); *United States v. Porter*, No. CR 22-00277, 2023 WL 2527878, at *2–4 (W.D. La. Mar. 14, 2023); *United States v. Smith*, No. 22-CR-20351, 2023 WL 2215779, at *3–4 (E.D. Mich. Feb. 24, 2023); *United States v. Gleaves*, No. 3:22-cr-00014, --- F. Supp. 3d ---, 2023 WL 1791866, at *4 (Feb. 6, 2023); *Hammond*, 2023 WL 2319321, at *7; *United States v. Farley*, No. 22-CR-30022, 2023 WL 1825066, at *3 (C.D. Ill. Feb. 8, 2023); *Bernard*, 2022 WL 17416681, at *8; *United States v. Anderson*, No. 21-cr-13, 2022 WL 10208253, at *1 (W.D. Va. Oct. 17, 2022); *United States v. Nutter*, No. 21-cr-00142, --- F. Supp. 3d ---, 2022 WL 3718518, at *6–7 (S.D. W. Va. Aug. 29, 2022); *Jackson*, 2022 WL 3582504, at *3; *see also United States v. Hoeft*, No. 4:21-CR-40163-KES, 2023 WL 2586030, at *6–7 (D. S.D. Mar. 21, 2023) (denying as-applied challenge to § 922(g)(9) as premature).

[114] *See, e.g.*, *Nutter*, 2022 WL 3718518, at *7 (citing Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 WASH. U.L. REV. 1187, 1239 (2015); Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1377 (2009); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461, 480 (1995)); *Porter*, 2023 WL 2527878, at *3.

[115] *Smith*, 2023 WL 2215779, at *4 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963)).

[116] This subsection prohibits possession of firearms by those who are "unlawful user[s] of or addicted to any controlled substance" as defined by the federal Controlled Substances Act.

[117] 2023 WL 1771138, at *4.

[118] *Id.* at *15.

[119] *Id.* (quoting *Folajtar v. Att'y Gen.*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, J., dissenting)).

domestic-violence misdemeanant[] can demonstrate that such a person poses a significant risk of causing public injury."[120]

Likewise, the Fifth Circuit's reasoning in *United States v. Rahimi*[121] does not negate comparisons between § 922(g)(9) and historical regulations that evince a tradition of restricting firearm possession by classes of individuals perceived as dangerous.[122] In *Rahimi*, the Fifth Circuit reviewed several historical analogues to 18 U.S.C. § 922(g)(8), which prohibits possession of firearms by individuals who are subject to a domestic violence restraining order.[123] The historical regulations proffered by the government were similar to those proffered in this case, including "English and American laws (and sundry unadopted proposals to modify the Second Amendment) providing for disarmament of 'dangerous' people[.]"[124] In rejecting these historical regulations as potential precursors to § 922(g)(8), the Fifth Circuit was careful to focus on § 922(g)(8)'s four "key features": "(1) forfeiture of the right to possess weapons (2) after a *civil* proceeding (3) in which a court enters a protective order based on a finding of a 'credible threat' to *another specific person*, or that includes a blanket prohibition on the use, of threatened use, of physical force, (4) in order to protect *that person* from domestic gun abuse."[125]

The Fifth Circuit's description of § 922(g)(8) highlights crucial differences between that statute and § 922(g)(9). Unlike § 922(g)(8), § 922(g)(9) affects individuals who have been convicted in a criminal proceeding and does not "work[] to eliminate the Second Amendment right of individuals subject merely to a civil process."[126] Moreover, laws disarming "dangerous" classes of people have more utility as historical analogues to § 922(g)(9) than to § 922(g)(8) because, as the Fifth Circuit found, the purpose of these laws "was ostensibly the preservation of political and social order, not the protection of an *identified person* from the threat of domestic gun abuse posed by *another individual*."[127] The Court therefore is not persuaded that the Fifth Circuit's reasoning in *Rahimi* applies to this case.

For the reasons above, the Court rejects Padgett's objection that the Magistrate Judge erroneously concluded that § 922(g)(9) comports with a historical tradition of restricting firearm possession by those legislatures have deemed to be dangerous. The Court therefore declines to modify the R&R on this basis.

---

[120] *Id.*
[121] 61 F.4th 443 (5th Cir. 2023).
[122] *See* Dkt. 48; Dkt. 49.
[123] 61 F.4th at 456–61.
[124] *Id.* at 456.
[125] *Id.* at 455 (internal quotation marks omitted) (emphasis added).
[126] *See id.* at 455 n.7.
[127] *Id.* at 457 (citation and internal quotation marks omitted) (emphasis added).

15

*D. Conclusion*

The Court concludes that the Magistrate Judge correctly determined that 18 U.S.C. § 922(g)(9) is not unconstitutional as applied to Padgett. Accordingly, the Court **ACCEPTS AND ADOPTS** the R&R at Docket 44 and **DENIES** the Motion at Docket 24.

Entered at the direction of the Honorable Timothy M. Burgess, United States District Judge.

DATE: April 18, 2023.